## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| MIGUEL A. MARTINEZ CRUZ,<br><br>               Plaintiff,<br><br>v.<br><br>FIRST ADVANTAGE BACKGROUND SERVICES CORP., and EXPERIAN INFORMATION SOLUTIONS, INC.<br><br>               Defendants. | **Case No.:** 3:23-cv-517<br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Miguel Angel Martinez Cruz ("Plaintiff" or "Mr. Martinez") by and through his counsel brings the following Complaint against First Advantage Background Services Corp. ("First Advantage") and Experian Information Solutions, Inc. ("Experian") (collectively "Defendants") for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*

## **INTRODUCTION**

1. This is an individual action for damages costs, and attorney's fees brought against Defendants pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA").

2. Defendants are consumer reporting agencies ("CRAs") that compile and maintain files on consumers on a nationwide basis. They sell consumer reports generated from their files and databases and furnish these consumer reports to other consumer reporting agencies and employers, which is ultimately used to make decisions regarding whether to offer employment to certain consumers.

1

3.      First Advantage produced and sold consumer background check reports, otherwise known as employment-purposed consumer reports - concerning Plaintiff to at least two of Plaintiff's prospective employers.

4.      Within First Advantage's reports, First Advantage included a section concerning Plaintiff's alleged criminal history and a section concerning Plaintiff's Social Security Number ("SSN").

5.      First Advantage erroneously matched criminal records, a driving while intoxicated ("DWI") conviction, to Plaintiff and published that criminal record, which does not belong to Plaintiff, in a consumer report about Plaintiff to one or more third parties.

6.      First Advantage's inaccurate reporting could have easily been avoided had First Advantage performed a cursory review of the widely available underlying public court records from Dallas County, Texas, from where the aforementioned criminal record originated, prior to publishing the information to Plaintiff's prospective employers.

7.      Further, First Advantage also reported that Plaintiff's SSN was unverifiable.

8.      The information First Advantage sold and published to its customers concerning Plaintiff's SSN was originally sold and published to First Advantage by Experian.

9.      Upon information and belief, Plaintiff's prospective employers denied Plaintiff's job applications after receiving the background check reports from First Advantage, in which First Advantage published the DWI convictions and/or unverifiable SSN alert.

10.      Experian published information to at least two entities, First Advantage and non-party RentGrow, which indicated that Plaintiff's SSN was unverifiable.

11.     Upon information and belief, Experian published information indicating Plaintiff's SSN was unverifiable because Experian affiliated consumer information that did not belong to Plaintiff within Plaintiff's Experian file.

12.     Defendants do not employ reasonable procedures to assure the maximum possible accuracy of the information they report regarding consumers. Defendants' failure to employ reasonable procedures resulted in Plaintiff's reports being grossly inaccurate.

13.      Defendants committed these violations pursuant to their standard policies and practices, which harm innocent consumers seeking employment by prejudicing their prospective employers with inaccurate information.

14.     Defendants' inaccurate reports cost Plaintiff employment opportunities and job security.

15.     As a result of Defendants' violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities; wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct the background check report; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

16.     As a result of Defendants' conduct, action, and inaction, Plaintiff brings claims against Defendants for failing to follow reasonable procedures to assure maximum possible accuracy based on 15 U.S.C. § 1681e(b) of the FCRA.

## **PARTIES**

17.     Plaintiff Miguel Angel Martinez Cruz is a natural person residing in Waterbury, Connecticut, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

18.     Defendant Experian Information Solutions, Inc. is an Ohio corporation doing business throughout the United States, including the State of Texas and in this District, and has a principal place of business located at 475 Anton Boulevard, Costa Mesa, California 92626.

19.     Defendant First Advantage Background Services Corp. is a Florida corporation doing business throughout the United States, including the State of Texas and in this District, and has a principal place of business located at 1 Concourse Parkway NE, Suite 200, Atlanta, Georgia, 30328.

20.     Defendants are consumer reporting agencies as defined in 15 U.S.C. § 1681a(f) because for monetary fees, they regularly engage in the practice of evaluating and/or assembling information on consumers for the purpose of furnishing consumer reports for tenant screening purposes to third parties, and use interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATUTORY BACKGROUND

23.     Enacted in 1970, the FCRA's passage was driven in party by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or credit, and when they applied for housing.  Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

24.     While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports.  15 U.S.C. § 1681.

25.     Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

26.     Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

## SUMMARY OF THE FAIR CREDIT REPORTING ACT

27.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

28.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. See 15 U.S.C. § 1681(a).

29.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with

regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. See 15 U.S.C. § 1681(b).

30.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

31.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## THE FCRA'S PROTECTIONS FOR CONSUMERS

32.     Credit bureau defendants, like Experian, sell millions of consumer reports (often called "credit reports" or "reports) per day.

33.     Despite its name, the Fair Credit Reporting Act covers more than just credit reporting, it also regulates employment background check reports like the ones First Advantage prepared in Plaintiff's name.

34.     The FCRA provides a number of protections for consumers who are the subject of consumers reports or background checks for the purpose of securing employment, housing, and other purposes.

35.     In the parlance of the FCRA, background checks are "consumer reports," and providers of background checks, like First Advantage, are "consumer reporting agencies."  15 U.S.C. §§ 1681a(d) and (f).

36.     The FCRA imposes duties on consumer reporting agencies, like Defendants, to assure that consumer reports are accurate and that "consumer reporting agencies exercise their

grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

37.     Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

38.     Defendants disregarded their duties under the FCRA with respect to Plaintiff's consumer reports.

**EXPERIAN'S ILLEGAL BUSINESS PRACTICES**

39.     Experian has intentionally established procedures for collection and reporting of consumer information in a way to make more money for itself, to create greater economic value for its paying clients that purchase consumer reports, and to shift the cost of finding out about inaccuracies, disputing inaccuracies, and correcting the consumer reports off onto unwilling consumers.

40.     Experian has been on notice about the specific and systemic inaccuracies and limitations of its gathering, compiling, and reporting of social security and other third-party information since at least 2009, *Souter v. Experian Information Solutions*.

41.     Experian has been on substantial notice for decades that its business practices and procedures, including loose matching algorithms, give rise to mixing the files of consumers.

42.     As early as 1991, the Federal Trade Commission ("FTC") brought an enforcement action against Experian [formerly TRW, Inc.] in the United States District Court for the Northern District of Texas. *FTC v. TRW, Inc.*, 784 F. Supp. 361 (N.D. Texas 1991). In settling the enforcement action brought by the AGs, Experian agreed to maintain reasonable procedures to prevent the occurrence or reoccurrence of mixed files. Another enforcement action was brought

against Experian by nineteen state attorneys general that resulted in a similar consent order as described in the previous paragraphs, including the procedures related to the prevention of mixed files and procedures to reinvestigate disputes resulting from mixed files. *See TRW, Inc. v. Morales*, Civil Action No. 3-91-1340-H (N.D. Tex. 1991).

43.     Similar enforcement actions were brought in 1992 and 2016, which resulted in consent orders where all three nationwide CRAs agreed to maintain reasonable procedures to prevent the occurrence or reoccurrence of mixed files, among other things.

44.     Despite the consent orders with the FTC and the Attorneys General, the Experian's computer system causes these mixes because it does not require or use full identifying information for a third-party's inquiry even when unique identifiers such as a full Social Security Number are present.  It does this in order to sell more consumer reports.

45.     Experian has knowledge that its computer system causes one individual's consumer report to be confused with another individual's consumer report causing a "mixed file."

46.     Moreover, Experian has actual knowledge that the three major credit bureaus have been sued repeatedly for failing to prevent mixed consumer files, including an $18.6 million dollar verdict against Equifax after it placed the information of another consumer into a plaintiff's record with the same name and failed to correct its errors. *Miller v. Equifax Information Services*, LLC, 3:11-cv-1231 (D. Or. 2011); *see also Calderon v. Experian Info. Solutions, Inc.*, 2012 U.S. Dist. LEXIS 89375, *10 (D. Idaho 2012); *Howley v. Experian Information Solutions, Inc*., Civil Action No. 09-241 (D.N.J. filed January 16, 2009); *Ainsworth v. Experian Info. Solutions, Inc.*, 2011 U.S. Dist. LEXIS 63174 (C.D. Cal. 2011); *Novak v. Experian Info. Solutions, Inc.*, 782 F. Supp. 2d 617 (N.D. Ill. 2011); *Comeaux v. Experian Info. Solutions*, 2004 U.S. Dist. LEXIS 10705, *20 (E.D. Tex. 2004); *Cartwright v. Experian*, et al., Case No. CV 09-427 (C.D. Cal. 2009); *Campbell v.*

*Experian Info. Solutions, Inc.*, 2009 U.S. Dist. LEXIS 106045 (W.D. Mo. Nov. 13, 2009); *Jensen v. Experian Info. Solutions, Inc.*, 2001 U.S. Dist. LEXIS 15134 (E.D. Tex. Mar. 30, 2001); *Williams v. Equifax Information Solutions, LLC*, No. 48-2003-CA-9035-O (Orange County 2007); *Apodaca v. Discover Financial Services*, 417 F. Supp. 2d 1220 (D.N.M. 2006)

47.     Numerous cases alleging a mixed file and/or a failure to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports and consumer files it publishes and maintains have also been brought in this District and Division. *See e.g.*, *Mullins v. Equifax Information Services, LLC*, 3:05cv888, 2007 WL 2471080 (E.D. Va. August 27, 2007); *Saunders v. Branch Banking and Trust Co.*, 3:05cv731 (E.D. Va.); *Ross v. Experian Information Solutions, Inc.*, 3:09cv144 (E.D. Va. 2009); *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235 (4th Cir. 2009); *Sloane v. Equifax Info Servs.*, 510 F.3d 495 (4th Cir. 2007); *Chaudhary v. Experian Info. Solutions, Inc.*, Civil No. 3:13-cv-577 (E.D. Va. 2013).

48.     Experian knowingly chooses to ignore these notices of its mixed file problems. It does so even though as it already possesses a simple, easy, and inexpensive means to correct and avoid the problem.

49.     Despite these lawsuits and enforcement actions, Experian has not significantly modified its procedures to assure that the consumer reports that it prepares, publishes, and maintains are as accurate as possible, as required by the FCRA at 15 U.S.C. § 1681e(b).

50.     Upon information and belief, Experian has not, and does not intend, to meaningfully modify its procedures to comply with this section of the FCRA because compliance would drastically increase its operating expenses.

**FIRST ADVANTAGE'S ILLEGAL BUSINESS PRACTICES**

51.     Over the past 15 years, there has been increased collection and aggregation of consumer data, including criminal records and sex offender registration data.  As a result of the increasing availability of this data, there has been a boom in the tenant screening industry.

52.     As summarized in a recent report by the Consumer Financial Protection Bureau[1], a 2018 survey of employers found that 95 percent of employers surveyed conducted one or more types of background screening. CFPB Report at 4.

53.     The criminal background check industry takes in revenues in excess of three billion dollars, annually.[2]

54.     Criminal background checks are generally created by running automated searches through giant databases of aggregated criminal record data. The reports are created and disseminated with little to no manual, in-person review, and the underlying court records are rarely directly reviewed in creating criminal background checks.

55.     Background check companies, like First Advantage, collect millions of records from a number of sources with data from county, state, and federal level sources.  The data included on the reports is often not obtained directly from court records on an individual basis but instead is purchased in bulk or scraped from court websites.

56.     Given that First Advantage is in the business of selling background reports, First Advantage should be well aware of the FCRA and the attendant harm to consumers for reporting inaccurate or outdated information.

---

[1]     CFPB, Market Snapshot: Background Screening Reports (Oct. 2019), https://fiels.consumerfinance.gov/f/documents/201909_cfpb_market-snapsho-background-screening_report.pdf ("CFPB Report").
[2]     IBISWorld, Inc., *Background Check Services in the US: Report Snapshot*, available at http://www.ibisworld.com/industry/background-check-services.html.

57.     First Advantage places its business interests above the rights of consumers and report such inaccurate information because it is cheaper for First Advantage to produce reports containing information that is inaccurate and incomplete than it is for First Advantage to exert proper quality control over the reports prior to their being provided to First Advantage's customers.

58.     First Advantage reports such erroneous and incomplete information because it wants to maximize the automation of its report creation process, thereby saving the costs associated with conducting the additional review necessary to remove the inaccurate or out-of-date entries.

59.     First Advantage charges its customers the same price for reports that are grossly inaccurate as it does for accurate reports.

60.     Appropriate quality control review of Plaintiff's report would have made clear that First Advantage was reporting misdemeanor convictions belonging to another consumer.

61.     As a provider of background check reports, First Advantage should be aware of the FCRA requirements, as it is an accredited member of the Professional Background Screening Association ("PBSA"). PBSA hosts a conference at least once a year where presenters discuss compliance with federal and state reporting laws.

**Facts Applicable to First Advantage**

62.     In or around September 2021, Plaintiff applied for full-time employment with FedEx, by virtue of the independent contracting agency Freeway Logistics.

63.     Upon information and belief, in or around September 2021, Freeway Logistics extended a job offer to Plaintiff for the position to which he applied. The job offer was conditioned upon Plaintiff passing a background check ("employment report").

64.     Freeway Logistics contracted with Defendant First Advantage to conduct background checks, including criminal background checks and SSN verification, on its prospective employees.

65.     On or about September 9, 2021, Freeway Logistics ordered a criminal background check on Plaintiff from First Advantage.

66.     On or about January 13, 2022, in accordance with its standard procedures, First Advantage completed its consumer background check report ("employment report") about Plaintiff and sold the same to Freeway Logistics.

67.     Within that report, First Advantage published inaccurate information about Plaintiff.

68.     Specifically, First Advantage's reporting about Plaintiff included a grossly inaccurate misdemeanor from Dallas County, Texas, which appeared in the employment report as follows:

| Record Source | DALLAS COUNTY DISTRICT AND COUNTY COURTS |
| Type of Search | FELONY & MISDEMEANOR RECORD SEARCH |
| Search Type | FELONY & MISDEMEANOR RECORD SEARCH |
| Date of Search | 09/11/2021 |
| Given Name Searched | MIGUEL ANGEL MARTINEZ |
| Developed Name Searched | MIGUEL MARTINEZ |
| Full Match | Full matched by the following identifiers: Last Name, First Name, Middle Name, DOB |
| Case Reference # | MA1451752 |
| Name on File | MARTINEZ, MIGUEL ANGEL |
| Address on File | TX 75253 |
| DoB on File | XX/XX/XXXX |
| Charge | DRIVING WHILE INTOXICATED 2ND OFFENSE |
| Charge Type | MISDEMEANOR |
| Disposition | GUILTY |
| Date | 06/03/2019 |
| Sentence | JAIL 21 DAYS; DRIVERS LICENSE SUSPENSION 2 YEARS; COSTS 482.1 |

69.     The criminal conviction reported by First Advantage about Plaintiff to Freeway Logistics does not belong to Plaintiff.

70.     Plaintiff has never been arrested for, charged with, or convicted of a DWI in his life.

71.     A cursory review of the widely available underlying public court records confirms that the record belongs to an unrelated male, Miguel Angel Martinez ("DWI Martinez").

72.     Had First Advantage actually consulted or obtained the widely available underlying public court records regarding the conviction, it would have seen obvious discrepancies between DWI Martinez and Plaintiff.

73.     The discrepancies that should have caused First Advantage to realize Plaintiff is not the same person as DWI Martinez include the following:

(i)     Plaintiff's legal name is "Miguel Angel Martinez Cruz," and the criminal record belongs to "Miguel Angel Martinez;"

(ii)    Plaintiff has never resided in Texas, which is confirmed and clearly indicated on the face of the subject employment report, yet the underlying public court records regarding the criminal conviction indicate that DWI Martinez resided in Dallas, Texas at the time he committed the offense; and

(iii)   Plaintiff's Social Security number, which was provided to First Advantage, contained on the face of the subject employment report is entirely different than that of DWI Martinez.

74.     The sole reason the inaccurate criminal records were reported as belonging to Plaintiff was that First Advantage failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the employment report it sold about Plaintiff to Freeway Logistics.

75.     Had First Advantage followed reasonable procedures, it would have discovered that the inaccurate criminal conviction belongs to an unrelated individual with a different last name than Plaintiff, a different Social Security Number, and who resides in a different part of the country than Plaintiff.

76.     In preparing and selling a consumer report about Plaintiff, wherein First Advantage published to Freeway Logistics inaccurate information about Plaintiff, First Advantage failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

77.     Further, First Advantage also reported to Freeway Logistics that Plaintiff's SSN was unverifiable.

78.     First Advantage cited to the source of the SSN information as Experian.

79.     Upon information and belief, First Advantage requested a social security number verification, or otherwise known as an identity verification check, from Experian about Plaintiff.

80.     Upon information and belief, and as part of its request, First Advantage provided to Experian Plaintiff's: Name, Address, Date of Birth, and Social Security Number.

81.     Upon information and belief, Experian reported to First Advantage that Plaintiff's SSN was unverifiable.

82.     It is unclear why First Advantage and Experian indicated Plaintiff's SSN was unverifiable as Plaintiff has a valid SSN. However, as will be discussed in greater detail below, Plaintiff believes it is because Experian affiliated Plaintiff with another consumer's information.

83.     Following First Advantage's delivery of the employment report concerning Plaintiff to Freeway Logistics, Plaintiff was told by Freeway Logistics that his application was "pending."

84.     As time passed however, Plaintiff never heard further from Freeway Logistics, and understood that he would not be selected for the position for which he applied.

85.     Becoming anxious, Plaintiff then obtained a copy of the subject employment report and reviewed it himself.

86.     Plaintiff was shocked and humiliated upon reviewing and realizing that the criminal conviction of another, namely DWI Martinez, was published in the employment report First Advantage sold about Plaintiff to Freeway Logistics.

87.     Plaintiff contacted Freeway Logistics and informed them that he has never lived in Texas, that he is not DWI Martinez, that his last name is "Martinez Cruz," not "Martinez," and that he has a different social security number from that of DWI Martinez. Plaintiff explained that the criminal conviction of DWI Martinez does not belong to him.

88.     Plaintiff was very panicked, confused, and concerned about the impact of DWI Martinez's criminal conviction reported on the subject employment report – specifically, the impact of the same on his future.

89.     Specifically, First Advantage matched Plaintiff and DWI Martinez and published the criminal records of DWI Martinez onto the employment report about Plaintiff and sold that report to Freeway Logistics.  This exculpatory public record information was widely available to First Advantage prior to publishing Plaintiff's employment report to Freeway Logistics, but First Advantage failed to perform even a cursory review of such information.

90.     Accordingly, in or around February or March 2022, desperate to secure employment with Freeway Logistics and riddled with worry over the far-reaching impacts of being confused with DWI Martinez, Plaintiff disputed the inaccurate information with First Advantage by phone.

91.     Plaintiff identified himself and provided information to First Advantage to support his dispute.

92.     Upon information and belief, as part of the process of identifying himself, Plaintiff provided his social security number.

93.     Plaintiff specifically disputed the criminal record of DWI Martinez.

94.     Plaintiff specifically stated that the criminal record of DWI Martinez does not belong to Plaintiff.

95.     Plaintiff specifically asked First Advantage to investigate and delete DWI Martinez's criminal record from any employment report about Plaintiff.

96.     On or about April 1, 2022, Plaintiff received First Advantage's correspondence confirming that it had reinvestigated Plaintiff's dispute and removed the criminal record from the subject employment report.

97.     First Advantage also communicated to Plaintiff that it had issued a corrected employment report to Freeway Logistics.

98.     Upon review of the updated employment report, Plaintiff noticed that, while the criminal record belonging to DWI Martinez no longer appeared, First Advantage was "Unable to Validate" Plaintiff's social security number, and that "The results of the Social Security Number Validation do not provide a verification that the Social Security Number belongs to the Consumer of this report."

99.     Plaintiff was perplexed by this information on the First Advantage employment report.

100.    Plaintiff had a valid social security number.

101.    Plaintiff continued to follow up with Freeway Logistics and hopes that the job offer would be reinstated, however, Freeway Logistics did not renew its job offer to Plaintiff.

102.    Plaintiff reasonably believes that due to First Advantage's inaccurate reporting in the first instance and additionally publishing that Plaintiff's SSN was unverifiable, Freeway Logistics formed a negative opinion about Plaintiff and/or moved on to other candidates.

103.    In or around July 2022, Plaintiff applied for full-time employment as a delivery truck driver with Amazon, through Live Axle Trucking, LLC ("Live Axle").

104.    In or around July 2022, Life Axle extended a job offer to Plaintiff for the position to which he applied. The job offer was conditioned upon Plaintiff passing a background check.

105.    Upon information and belief, Live Axle contracted with First Advantage to conduct background checks, including criminal background checks and SSN verifications, on its prospective employees.

106.    On or about July 15, 2022, Live Axle ordered a criminal background check on Plaintiff from Experian.

107.    In or around July or August 2022, in accordance with its standard procedures, First Advantage completed its employment report about Plaintiff and sold the same to Live Axle.

108.    Upon information and belief, within that employment report, First Advantage again reported the aforementioned DWI conviction of DWI Martinez.

109.    Upon information and belief, First Advantage re-inserted the DWI conviction of DWI Martinez into Plaintiff's First Advantage Report in or around July 2022.

110.    Upon information and belief, First Advantage had a copy of the prior report and corrected report issued to Freeway Logistics.

111.    Upon information and belief, within the employment report sold to Live Axle, First Advantage also reported that Plaintiff's SSN was unverifiable.

112.    First Advantage again cited to the source of the SSN verification as Experian.

113.    Upon information and belief, First Advantage requested a social security number verification, or otherwise known as an identity verification check, from Experian about Plaintiff.

114.    Upon information and belief, and as part of its request, First Advantage provided to Experian Plaintiff's: Name, Address, Date of Birth, and Social Security Number.

115.    Upon information and belief, Experian reported to First Advantage that Plaintiff's SSN was unverifiable.

116.    Again, it is unclear why First Advantage and Experian indicated Plaintiff's SSN was unverifiable as Plaintiff has a valid SSN.

117.    In or around August 2022, Plaintiff was notified by Live Axle that his employment application was denied as his background check "Does not meet requirements."

118.    Upon information and belief, Live Axle denied Plaintiff's employment application due to the inaccurate DWI conviction and/or Plaintiff's "unverifiable" SSN.

119.    Had First Advantage followed reasonable procedures, it would have discovered that the inaccurate criminal conviction belongs to an unrelated individual with a different last name than Plaintiff, a different Social Security Number, and who resides in a different part of the country than Plaintiff.

120.    In preparing and selling a consumer report about Plaintiff, wherein First Advantage published to Freeway Logistics inaccurate information about Plaintiff, First Advantage failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

121.    In preparing and selling a consumer report about Plaintiff, wherein First Advantage published to Live Axel inaccurate information about Plaintiff, First Advantage failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

### Facts Applicable to Experian

122.    First Advantage contracted with Experian to conduct SSN verifications on consumers that First Advantage was preparing background check reports for.

123.    On or about September 9, 2021, First Advantage ordered a consumer report for SSN verification concerning Plaintiff from Experian in relation to the Freeway Logistics employment application.

124.    On or about July 15, 2022, First Advantage ordered a consumer report for SSN verification concerning Plaintiff from Experian in relation to the Live Axle employment application.

125.    On or about September 9, 2021 and July 15, 2022, in accordance with its standard procedures, Experian prepared consumer reports concerning Plaintiff and sold the same to First Advantage.

126.    In the reports sold and published to First Advantage, Experian reported that Plaintiff's SSN could not be verified.

127.    Upon information and belief, RentGrow contracted with Experian to conduct SSN verifications on consumers that RentGrow was preparing background check reports for.

128.    Upon information and belief, on or about March 11, 2022, RentGrow ordered a consumer report for SSN verification concerning Plaintiff from Experian for an employment purposed consumer report concerning Plaintiff.

129.    On or about March 11, 2022, in accordance with its standard procedures, Experian prepared a consumer report concerning Plaintiff and sold the same to RentGrow.

130.    Upon information and belief, in the report sold and published to RentGrow, Experian reported that Plaintiff's SSN could not be verified.

131.    Upon information and belief, Experian was unable to verify Plaintiff's SSN because Experian had affiliated Plaintiff with consumer information that did not belong to him.

132.    Upon information and belief, Experian failed to maintain reasonable procedures to assure maximum possible accuracy of the information it reported about Plaintiff.

133.    Specifically, upon information and belief, Experian's policies and procedures cause it to affiliate information with Plaintiff that did not belong to him.

134.    Upon information and belief, Experian reported an inaccurate date of birth, inaccurate names, and an inaccurate SSN in Plaintiff's Experian file.

135.    First Advantage's and Experian's inaccurate reporting caused Plaintiff to lose out on employment opportunities.

136.    Namely, the Defendants' false reports cost Plaintiff a promising, well-paying jobs with *at least* Freeway Logistics and Live Axle.

137.    Upon information and belief, Experian's inaccurate reporting caused additional denials as well.

138.    Due to the Defendants' unreasonable procedures in the first place, Plaintiff was forced to accept employment that, compared to the positions with Freeway Logistics and Live Axle (Amazon), was lower paying, provided less benefits, and afforded no overtime opportunity.

139.    The injuries suffered by Plaintiff as a direct result of the Defendants' erroneous reporting are the type of injuries that the FCRA was enacted to address. Under common law, the

Defendants' conduct would have given rise to causes of action based on defamation and invasion of privacy.

140.    As a result of the Defendants' violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct his background check report; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Defendants' Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

141.    Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

142.    Defendants are "consumer reporting agenc[ies]" as defined by 15 U.S.C. § 1681a(f).

143.    At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

144.    At all times pertinent hereto, the above-mentioned employment reports were also "consumer report[s]" as that term is defined by 15 U.S.C. § 1681a(d).

145.    Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the consumer reports they sold about Plaintiff as well as the information they published within the same.

146.     As a result of the Defendants' violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct his background check report; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

147.     Defendants willfully violated 15 U.S.C. § 1681e(b) in that their conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

148.     Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## 15 U.S.C. § 1681i
**First Advantage's Failure to Prevent the Reappearance of Previously Disputed Information**

149.     Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

150.     The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. See 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation. Id.

151.     The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the

accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

152.    On at least one occasion during 2022, Plaintiff disputed the inaccurate information with First Advantage and requested that First Advantage correct and/or delete the inaccurate information in the employment report that is patently inaccurate, namely, stating that he was convicted of a DWI.

153.    In response to Plaintiff's dispute, First Advantage removed the inaccurate DWI conviction from his report.

154.    However, First Advantage failed to prevent the inaccurate information's reappearance as required by 15 U.S.C. § 1681i.

155.    15 U.S.C. § 1681i(a)(5)(B)(i) mandates that information that was previously deleted from a consumer's file pursuant to subparagraph (A) "may not be reinserted in the file by the consumer reporting agency unless the person who furnishes the information certifies that the information is complete and accurate."

156.    Further, pursuant to 15 U.S.C. § 1681i(a)(5)(B)(ii), if any information that has previously been deleted from a consumer's file is reinserted into the file, a consumer reporting agency must "notify the consumer of the reinsertion in writing not later than 5 business days after the reinsertion or, if authorized by the consumer for that purpose, by any other means available to the agency."

157.    The FCRA also requires that consumer reporting agencies, like Defendant, "maintain reasonable procedures designed to prevent the reappearance in a consumer's file, and in consumer reports on the consumer, of information that is deleted pursuant to this paragraph." 15 U.S.C. § 1681i(a)(5)(C).

158.    First Advantage violated 15 U.S.C. § 1681i by reinserting previously deleted information without first receiving certification from the furnisher that the information is complete and accurate, by failing to notify Plaintiff of the reinsertion in writing within 5 business days after the reinsertion, and failing to maintain reasonable procedures to prevent the reappearance of previously deleted information in Plaintiff's file.

159.    As a result of First Advantage's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct her background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to her reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

160.    First Advantage willfully violated 15 U.S.C. § 1681i in that its conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, First Advantage was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

161.    Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from First Advantage in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for the following relief:

i.    Determining that Defendants negligently and/or willfully violated the FCRA;

    ii.      Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

    iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

    iv.    Granting further relief, in law or equity, as this Court may deem appropriate and just.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Respectfully submitted this 25th day of April 2023.

**STEIN SAKS, PLLC**
*/s/ Yaakov Saks*
Yaakov Saks, Esq.,
Bar No. ct30021
One University Plaza, Suite 620
Hackensack, NJ 07601
T: 201-282-6500 ext 101
F: 201-282-6501
E: ysaks@steinsakslegal.com

*Attorney for Plaintiff*
Miguel A. Martinez Cruz